UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| ROBBIE DALE BELEW, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 3:16-cv-214 |
| | ) |
| SECO ARCHITECTURAL SYSTEMS, INC. | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion for Summary Judgment [doc. 14], Defendant's Brief in Support of the Motion [doc. 15], Plaintiff's Response [doc. 18], Defendant's Reply [doc. 20], Plaintiff's Supplemental Response [doc. 26], and Defendant's Supplemental Reply [doc. 31]. For the reasons herein, the Court will deny the motion.

### I.  BACKGROUND

Born in 1953, Robbie Dale Belew ("Mr. Belew") began his career with Defendant SECO Architectural Systems, Inc. ("SECO")—a company that fabricates and installs wall panels primarily for large-scale construction projections—in 1991 as a sheeter, or an installer of metal siding. [Belew Dep., doc. 15-1, 50:25; 51:1–11; Creighton Decl., doc. 15-2, ¶¶ 2, 13]. Mr. Belew later became a construction manager with SECO and was responsible for the oversight of projects in states throughout the Southeast. [Belew Dep. at 61:15–25; 62:1–5; Creighton Decl. ¶ 6]. By 2014, SECO employed three construction

managers, each of whom was based in a different state. [Creighton Dec. ¶ 6]. As one of those three construction managers, Mr. Belew was based in Jacksboro, Tennessee, where he maintained an office. [Belew Dep. at 101:24–25, 102:1; Creighton Decl. ¶ 6]. At some time in 2014, SECO published a company-wide newsletter called "The SECO Outlook," [doc. 18-1], in which Joseph Creighton ("Mr. Creighton"), SECO's president and co-owner, [Creighton Decl. ¶ 1], wrote:

> It has been said that the future belongs to the young. It has also been said that those that don't plan for the future, won't have much of a future!
>
> In the ever-changing business world, which moves faster with every passing day, those companies that don't plan and prepare for the near-term future or the long term future, simply won't have a future!
>
> Of course, one of the pillars of SECO's core philosophy has been to always self-perform our field operations. As such, since day-one, back in 1989, SECO's field forces have been direct SECO employees. In fact, several of the foremen who started out with SECO leading our field efforts are still leading our field efforts nearly 25 years later!
>
> This amazing longevity is the primary reason that SECO's field personnel are the most experienced professionals in the industry.
>
> If there is any downside to all of this experience, it's that some of our long timers are, shall we say, not "spring chickens"! Looking forward, SECO management has recognized the need to take advantage of our seasoned personnel as teachers and mentors of the next generation of foreman and crew leaders. This is an ongoing process, of course, but several of our next-generation field leaders have already come to the forefront.
>
> These "young guns", the future of SECO's field leadership, have taken full advantage of the vast knowledge and skills possessed by our experienced leaders and have thereby accelerated their learning process.
>
> We'd like to introduce you to some of our future stars and their primary mentors.
>
> . . . .
>
> We are very fortunate to have all of these dedicated young professionals on our team.

> With this kind of talent within our field leadership supplemented by dozens of top-notch technicians and craftsmen, it looks as if SECO's customers of the future will continue to have their needs met by the best field force in America, just like our customers of today!
>
> A big thank you goes out to our senior guys for helping to secure a bright future for SECO by selflessly passing on their invaluable knowledge to the next generation!

[The SECO Outlook at 15–16; Creighton Dep., doc. 26-1, 66:10–25; 67:1–23].

In December 2014, Mr. Creighton maintains that he and SECO's founder and co-owner, Dick Waldron, "began discussing ways to streamline company operations and cut costs" and decided that SECO did not require three construction managers. [Creighton Decl. ¶¶ 3, 7–9]. As a result, they demoted Mr. Belew, who was about sixty years old at the time, to a position that required him to perform safety audits and order equipment for construction projects, [Belew Dep. at 75:14–25; 76:1–23]; terminated one of the other construction managers, who was forty-five years old, [Creighton Decl. ¶ 10]; and promoted the third construction manager, Troy Strickland ("Mr. Strickland"),[1] who assumed responsibilities for all of SECO's construction projects, [*id.* ¶ 9]. Mr. Belew, in his new position, "no longer had any management authority," [*id.* ¶ 10], and he not only had fewer responsibilities but also received less wages, [Belew Aff., doc. 18-1, ¶ 7]. Specifically, his work dealt with projects in Tennessee, limiting the reach he once had over projects throughout the Southeast. [Creighton Decl. ¶ 10; Belew Aff. ¶ 7].

According to Mr. Creighton, SECO's management "continued to consider ways to decrease costs and improve efficiency" in 2015. [Creighton Decl. ¶ 11]. These considerations took place, at least in part, between Mr. Creighton and Mr. Strickland,

---

[1] The record contains no information regarding Mr. Strickland's age.

who recommended that Mr. Belew should be terminated because he brought no value to the management of projects in his new position, his workload was not heavy enough to justify his employment, and other employees were already performing or were capable of performing his duties. [*Id.* ¶ 11; Strickland Decl., doc. 15-3, ¶ 10]. Mr. Strickland also recommended that the office in Jacksboro should be closed as an additional cost-saving measure. [Creighton Decl. ¶ 11]. Based on Mr. Strickland's advice, Mr. Creighton agreed to shutter the Jacksboro office and confirmed Mr. Belew's termination, [*id.*; Creighton Dep. at 94:16–20].

In January 2016, Mr. Strickland met with Mr. Belew and informed him of his dismissal. [Belew Dep. at 112:14–25; 113:1–6; Belew Aff. ¶ 8; Creighton Dep. at 92:14–23; 93:20–23].[2] Mr. Belew maintains that Mr. Strickland told him he was being released because SECO did "[n]ot [have] enough work in Tennessee at that time." [Belew Dep. at 113:2–6]. Mr. Belew, however, was aware that SECO was currently completing two or three projects in Tennessee, [*Id.* at 114:6–22]—a larger number of projects than it normally had in progress at any one time in Tennessee, [*id.* at 115:17–20]. He also knew that SECO had three or four projects booked in Tennessee and had yet to begin work on them. [*Id.* at 113:12–25; 114:1–3]. After his firing, Mr. Belew learned that SECO was placing advertisements for several positions including construction manager, his former position, and other field personnel. [Belew Aff. ¶ 20; SECO Job Advertisement, doc. 18-1, at 29; *see* Creighton Dep. at 90:9–20]. Mr. Belew also learned that SECO promoted a member of his former construction crew, Dennie Neal ("Mr. Neal"), from "a foreman to

---

[2] Mr. Belew held his new position for roughly a year. [*See* Strickland Decl. ¶¶ 6–11].

4

the position of overseeing construction in the Tennessee area." [Belew Aff. ¶ 10]. In this role, Mr. Neal, according to Mr. Belew, was "performing the duties which [he] had performed." [*Id.* ¶ 9]. Mr. Belew, who was sixty-two years old when SECO terminated him, describes Mr. Neal as being "substantially younger than [him]," by a margin of at least ten or fifteen years, and as less experienced than him. [*Id.* ¶¶ 9, 13, 19–20]. As a result, he brings this action against SECO and claims that SECO wrongfully terminated him because of his age, in violation of the Tennessee Human Rights Act ("THRA"), section 4-21-401. SECO now moves for summary judgment on Mr. Belew's claim.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to withstand summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III. ANALYSIS

The THRA is a "comprehensive anti-discrimination law." *Wilson v. Rubin*, 104 S.W.3d 39, 48 (Tenn. Ct. App. 2002) (citation omitted). One of the THRA's purposes is to "[s]afeguard all individuals within the state from discrimination because of . . . age . . . in connection with employment," Tenn. Code. Ann. § 4-21-101(a)(3), by "[p]roviding for execution within Tennessee of the policies embodied in the federal . . . Age Discrimination in Employment Act," *id.* § 4-21-101(a)(1). Because the THRA is coextensive with the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, the same analysis applies to age discrimination claims under the THRA and the ADEA. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006). Like the THRA, the ADEA bars an employer from discharging an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on an age discrimination claim under the ADEA, an employee must do more than show that his age was "a motivating factor" in the employer's decision to discharge him; rather, the ADEA's "'because of' language" requires an employee to establish by a preponderance of the evidence that his age was the but-for cause for the employer's decision. *Scheick v. Tecumseh Public Schs.*, 766 F.3d 523, 529 (6th Cir. 2014) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). In other words, the employee's age must be "*the* 'reason' that the employer decided to act." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2527 (2013) (emphasis added) (quotation omitted).

To establish an age discrimination claim, an employee can rely on either direct or circumstantial evidence. *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Although these two "evidence paths are mutually exclusive," *Scheick*, 766 F.3d at 529 (quotation omitted), "[t]he ultimate question" for a court when considering either of these types of evidence "is whether the plaintiff was the victim of intentional discrimination," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146–47 (2000) (citation omitted). In this case, Mr. Belew concedes that his claim for age discrimination consists of circumstantial evidence, not direct evidence. [Pl.'s Resp. at 7–8]. Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination

7

occurred." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quotation omitted). To state a prima facie case of age discrimination when relying on circumstantial evidence, an employee must satisfy the four elements in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010).

> [A] plaintiff must establish a *prima facie* case by showing that (1) he was at least 40 years old at the time of the alleged discrimination, (2) he was subjected to an adverse employment action, (3) he was otherwise qualified for the position, and (4) the successful applicant was substantially younger than the plaintiff.

*Bush v. Dictaphone Corp.*, 161 F.3d 363, 368 (6th Cir. 1998) (citation omitted); *see generally McDonnell Douglas*, 411 U.S. at 793.

If the employee succeeds in constructing a prima facie case under these elements, "an inference of discrimination arises." *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000); *see Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 n.7 (6th Cir. 1990). The burden of production then shifts to the employer, who, to escape this inference of discrimination, must "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Schoonmaker*, 595 F.3d at 264 (citation omitted). If the employer meets this burden, the burden of production shifts back to the employee to demonstrate that the employer's reason is "a mere pretext for intentional age discrimination." *Id.* (citation omitted). This burden-shifting framework applies "at all stages of the proceedings, including motions for summary judgment." Tenn. Code Ann.

---

[3] "*McDonnell Douglas* and subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'" *Reeves*, 530 U.S. at 142 (quotation omitted).

8

§ 4-21-311(e).[4] "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (quotation omitted); *see Schoonmaker*, 595 F.3d at 264 (stating that the burden of persuasion at all times remains on the employee to show that "age was the 'but-for' cause of the[] employer's adverse action" (internal quotation marks and quotation omitted)).

### A. Prima Facie Case

SECO argues that Mr. Belew falls short of establishing a prima facie case of age discrimination because he fails to satisfy *McDonnell Douglas*'s fourth element, which, again, requires the employer to replace the employee with a substantially younger applicant. [Def.'s Br. at 8–9]. Although Mr. Belew filed an affidavit showing that SECO replaced him with a substantially younger person in Mr. Neal, [Belew Aff. ¶¶ 9, 10–11, 13, 19–20], SECO urges the Court to ignore this evidence because Mr. Belew originally

---

[4] Although the Tennessee Supreme Court, in *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 785 (Tenn. 2010), held that "the McDonnell Douglas framework is inapplicable at the summary judgment stage because it is incompatible with Tennessee summary judgment jurisprudence," federal district courts in Tennessee have concluded that *Gossett* does not govern federal diversity actions. *See Boges v. Gen. Motors Co.*, 808 F. Supp. 2d 1043, 1051 (M.D. Tenn. 2011) ("*McDonnell Douglas* [i]s still the appropriate standard for federal district courts in Tennessee to apply because *Gossett* announced a state procedural rule, not a substantive rule that would be applied by a federal court sitting in diversity." (citations omitted)); *Reed v. Inland Intermodal Logistics Servs., LLC*, No. 09-2607, 2011 WL 4565450, at *5 (W.D. Tenn. Sept. 29, 2011) ("Despite *Gossett*, both parties assume that *McDonnell Douglas* applies. They are correct because *Gossett* stated a procedural rule inapplicable in federal courts[.]"); *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) ("'Under the *Erie* doctrine,' it is long settled, 'federal courts sitting in diversity apply state substantive law and federal procedural law.'" (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996))).

testified that no one replaced him after his termination, [Def.'s Reply at 2–3; *see* Belew Dep. at 120:3–17]. SECO argues that Mr. Belew, to shore up his case and fend off the motion for summary judgment, contradicted this testimony in his affidavit, in which he introduced information about Mr. Neal for the first time. [Def.'s Reply at 2–3; *see* Belew Aff. ¶¶ 9, 10–11, 13, 19–20]. SECO contends that Mr. Belew's actions are improper and supports its position by citing *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35 (6th Cir. 2009), in which the Sixth Circuit stated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony," *id.* at 40 (quotation omitted)).

SECO's argument, however, does not necessarily entitle it to summary judgment because an employee can also satisfy *McDonnell Douglas*'s fourth element by showing that the employer, after firing the employee, sought applications to fill the employee's position:

> To make a prima facie case of age discrimination, a plaintiff must ordinarily show [1] that he is a member of a protected class, [2] that he suffered an adverse employment action, [3] that he was qualified for the job, and [4] *that the employer sought applications to fill the position*.

*Abney v. Elec. Data Sys. Corp.*, No. 98-3079, 1999 WL 357797, at *2 (6th Cir. 1999) (emphasis added) (citation omitted); *see Barnes*, 896 F.2d at 1464 n.6 (stating that, in the context of an age discrimination case, *McDonnell Douglas*'s fourth element requires the employee to show "that the employer continued to seek job applicants after the plaintiff was rejected"); *see also Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (recognizing that, under the ADEA, *McDonnell Douglas*'s fourth element

10

requires an employee to show that "he was replaced by a substantially younger employee, *or* additional evidence . . . [that] the employer was motivated by age" (emphasis added) (citation omitted)).

Although SECO concedes that "the fourth prong of the *prima facie* case can be established by other evidence" of age discrimination, [Def.'s Br. at 7], it ignores record evidence showing it was actively inviting applications for construction managers as well as other field personnel in 2016,[5] the very same year of Mr. Belew's termination, [SECO Job Advertisement at 29; Creighton Dep. at 90:9–25].[6] Together with the other prima facie elements, which SECO does not challenge, this evidence "raises an inference of discrimination because the plaintiff has demonstrated that the adverse employment action did not result from a lack of qualifications or the absence of a vacancy." *Abney*, 1999 WL 357797 at *2. But in light of SECO's declaration that Mr. Belew's discharge was due to business considerations—namely the absence of a sufficient workload for Mr. Belew, leading to his inability to "add[] anything of value" to the company, [Strickland Decl. ¶ 10]—this case typifies a work force reduction case. *See Barnes*, 896 F.2d at 1465 (defining broadly the term "work force reduction" as any "business consideration[] [that] causes an employer to eliminate one or more positions within the company"). In this type

---

[5] The vacancies for field personnel included positions for foremen. [SECO Job Advertisement at 29]. According to Mr. Creighton, foremen are responsible for "making site visits and providing Mr. Strickland with updates" on projects. [Creighton Decl. ¶ 12]. These responsibilities appear to be the same as or similar to those that Mr. Belew had in his most recent position as a safety auditor. [*See* Belew Dep. at 75:14–25; 76:1–23].

[6] A court's "analysis of temporal proximity in the circumstantial evidence context is even more flexible" than in the direct-evidence context. *Reed v. Am. Cellular, Inc.*, 39 F. Supp. 3d 951, 969 (M.D. Tenn. 2014) (citation omitted); *see Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) (determining that conduct that occurred fourteen months before an employee's termination was relevant circumstantial evidence of discrimination).

of case, an inference of discrimination is not enough to shuttle an ADEA claim past the prima facie stage:

> To make a prima facie case of age discrimination, a plaintiff must ordinarily show that he is a member of a protected class, that he suffered an adverse employment action, that he was qualified for the job, and that the employer sought applications to fill the position. [S]uch a showing raises an inference of discrimination . . . . When a termination results from a reduction in force, however, the most common reason for the termination is the workforce reduction and, thus, a plaintiff, in order to establish a prima facie case, must provide "*additional* direct, circumstantial or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."

*Abney*, 1999 WL 357797 at *2 (emphasis added) (citations and quotation omitted); *see Schoonmaker*, 595 F.3d at 265 ("[W]hen a termination arises as part of a work force reduction, the fourth element of the *McDon[n]ell Douglas* test is modified to require the plaintiff to provide 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" (quotation omitted)).

In sum, evidence of a work force reduction requires an employee to bolster the inference of discrimination that accompanies an employer's attempt to fill his former position. To do so, the employee must summon evidence "indicating that the work force reduction[] [is] not the reason[] for the discharge." *Barnes*, 896 F.2d at 1465 (citation omitted).[7] Before reviewing Mr. Belew's evidence for this showing, the Court recognizes that it "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case" because the burden-

---

[7] The Sixth Circuit has referred to this showing as a "heightened standard to establish a *prima facie* case." *Geiger*, 579 F.3d at 623–24 (citation omitted).

12

shifting analysis would fall out of effect. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573 (6th Cir. 2003); *see Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–61 (6th Cir. 2000). ("[W]hen assessing whether a plaintiff has met her [burden] at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). In other words, the Court cannot rely on an employer's nondiscriminatory reason "as a predicate for finding [that the employee] . . . failed to make a prima facie case." *Cline*, 206 F.3d at 660. This "principle applies equally in a work force reduction setting," *Schoonmaker*, 595 F.3d at 266 (citation omitted), but the Sixth Circuit appears to treat a work force reduction as a de facto nondiscriminatory reason for an adverse action. In many cases, it moves straight from a prima facie analysis to an analysis of pretext, omitting an analysis of whether the employer has articulated a legitimate, nondiscriminatory reason for the adverse action. *See Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536–41 (6th Cir. 2014); *Schoonmaker*, 595 F.3d at 265–70; *Barnes*, 896 F.2d at 1463–76.

In this case, Mr. Belew directs the Court to additional circumstantial evidence that, in tandem with SECO's efforts to fill his position after his termination, is sufficient to indicate he was "singled out . . . for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465. First, Mr. Belew identifies Mr. Creighton's ageist remarks in SECO's newsletter, in which he describes SECO's veteran employees as "long timers" who are not "spring chickens," while touting his "young guns" as "the next generation of foreman and crew leaders" who will "come to the forefront." [The SECO Outlook at 15]. These

remarks are particularly relevant because they came from an upper-level official—the company's president,[8] in fact—who not only discussed Mr. Belew's termination with management but also confirmed it. *See Ercegovich*, 154 F.3d at 354–57 (underscoring the importance of discriminatory remarks that come from a managerial figure); *Geiger*, 579 F.3d at 624 (indicating that an ageist remark is pertinent when it comes from a person involved in the decision to discharge the employee). Mr. Creighton's remarks are also relevant because of their substance—they are not ambiguous or abstract, despite the fact that Mr. Creighton did not make them as an affront to Mr. Belew specifically. *See La Pointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (determining that a supervisor's remarks about "oldtimers" were evidence of age discrimination even though the supervisor did not direct them at the employee personally). Finally, Mr. Creighton's remarks are relevant because of their temporal proximity to Mr. Belew's termination, the two of which appear to have occurred about fourteen months apart from each other.[9] *See Ercegovich*, 154 F.3d at 357 (concluding that a senior official's ageist comments were not too distant to support a finding of age discrimination when they happened fourteen months before the employee's termination).

---

[8] The Court does not "mean to imply that any ageist comment by a corporate executive is relevant as evidence of discriminatory corporate culture." *Ercegovich*, 154 F.3d at 357 (citation omitted). But when an ageist comment comes from a company's president, the person who is likely to set the tone for the company as a whole, it carries more weight. *See id.* (instructing courts to evaluate "the declarant's position in the corporate hierarchy" when evaluating an ageist remark's probative value (quotation omitted)).

[9] Mr. Belew states that the edition of the SECO Outlook containing these remarks was published in 2014, but he does not specify the month of its publication, and the copy of the SECO Outlook in the record is undated. [Belew Aff. ¶ 14]. Even so, it appears to have been published late in 2014 because it has a separate section of upcoming employee anniversary dates occurring between mid November and mid February. [SECO Outlook at 13].

Second, during this fourteen-month timeframe, SECO subjected Mr. Belew to as many as *two* adverse employment actions—demotion and termination. Although SECO maintains that, after eliminating Mr. Belew's position as a construction manager, it "went out of its way to create a new position for him," [Def.'s Br. at 1], the fact is that its relegation of Mr. Belew to a safety auditor had every appearance of an adverse action because it stripped his managerial duties and reduced his wages, [Creighton Decl. ¶ 10; Belew Aff. ¶ 7]. *See Deleon*, 739 F.3d at 918 (recognizing that an employee's demotion is "evidenced by . . . significantly diminished material responsibilities," among other things like a change in wages or benefits (quotation omitted)); *see also Kira v. Arab Cmty. Ctr. for Econ. & Soc. Servs.*, 681 F. Supp. 2d 856, 863 (E.D. Mich. 2010) (stating that the "classic example" of adverse employment action is an employee's discharge and noting that "[o]ther examples" of adverse employment action include demotion (quotations omitted)). SECO then terminated Mr. Belew, despite acknowledgments from its management—including Mr. Creighton—that he did good work and was dedicated to his profession. [Creighton Dep. at 73:19–25; 74:1–4; Waldron Dep., doc. 31-2, at 20:23–25, 21:1–2; 73:17–22].

Third, although SECO claims it lacked work for Mr. Belew in Tennessee, Mr. Belew's termination occurred at time when SECO was engaged in multiple ongoing projects in Tennessee—a greater number than usual—and had other projects on the books there. [Belew Dep. at 113:12–25; 114:1–22; 115:17–20; Waldron Dep. at 39:8–16]. While SECO highlights the fact that it closed its Jacksboro office around this time, presumably as evidence of a paucity of projects in Tennessee, this evidence hardly

15

operates as metric for SECO's business in Tennessee. According to testimony from SECO's management, the Jacksboro office was primarily if not exclusively a storage facility and had no sales to begin with. [Creighton Dep. at 112:6–13; Waldron Dep. at 38:1–2]. Any sales from that region were handled remotely in SECO's offices in Georgia and North Carolina, [Waldron Dep. at 38:1–2], and those sales continued to occur even after Mr. Belew's termination, [Belew Aff. ¶ 9]. In short, the Jacksboro office's closure would appear to be a dubious justification for Mr. Belew's discharge, especially in light of the ongoing projects in Tennessee at the time. But the question of how this office's closure factors into this case is ultimately one for the jury and not the Court, whose task is not to weigh the evidence on summary judgment. Rather, the Court's task is to determine whether the record evidence—when coupled with SECO's efforts to fill Mr. Belew's position after his termination—is sufficient to allow a reasonable jury to conclude that SECO terminated Mr. Belew for impermissible reasons. *Barnes*, 896 F.2d at 1465. The Court has no reservations that the record evidence is sufficient to this end, and Mr. Belew has therefore satisfied his burden of constructing a prima facie case of age discrimination.

### B. Pretext

To establish pretext, the employee must produce sufficient evidence showing that the nondiscriminatory reason the employer offers for the adverse employment action (1) has no basis in fact, (2) was not the employer's actual motivation, or (3) did not warrant the adverse employment action. *Wexler*, 317 F.3d at 576. The ultimate inquiry under

these three factors is whether the employer discharged the employee "for the stated reasons or not." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quotation omitted). On summary judgment, specifically, the question under these factors is "whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). The employee "need only produce enough evidence . . . to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation omitted).

The evidence that Mr. Belew presents to the Court is sufficient to allow a reasonable jury to doubt SECO's reason for discharging him, in part because it shows that SECO relied on "shifting justifications" for his discharge. *Pierson*, 749 F.3d at 540; *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). In the evidence that SECO submits to the Court, both Mr. Creighton and Mr. Strickland declare that they terminated Mr. Belew because his diminished workload as a safety auditor translated into his failure to bring any value to SECO. [Creighton Decl. ¶ 11; Strickland Decl. ¶ 10]. Yet in their respective depositions, which Mr. Belew provides to the Court, they testified that they terminated Mr. Belew because SECO was rebranding its business model from industrial products to architectural products, an area in which, they believed, Mr. Belew had no expertise or interest. [Creighton Dep. at 74:17–20; 104:17–25; Strickland Dep. at 7:20–25; 8:1–2]. These conflicting rationales for Mr. Belew's termination are evidence of pretext:

> Shifting justifications over time call[] the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the employee] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination.

*Cicero*, 280 F.3d at 592; *see Thurman v. Yellow Freight Sys. Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext." (citations omitted)). The dueling reasons that SECO provides for Mr. Belew's discharge, in addition to the evidence underlying Mr. Belew's prima facie case, are more than enough to allow a reasonable jury to infer that SECO's motivation for Mr. Belew's termination was discriminatory. *See Reeves*, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."). As a result, Mr. Belew is entitled to move forward to trial with his claim.

### IV. CONCLUSION

Failing to establish that the record is without a genuine question of material fact as to Mr. Belew's claim under the THRA, SECO falls short of meeting its burden as the movant for summary judgment. SECO's Motion for Summary Judgment [doc. 14] is therefore **DENIED**.

**IT IS SO ORDERED**.

ENTER:


　　　　　　　s/ Thomas W. Phillips
　　　　　　United States District Judge